UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMOND SNOWDEN,<br><br>Defendant. | No. 1:16-cr-00031-DAD-BAM<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AND TO SUPPRESS EVIDENCE<br><br>(Doc. No. 17) |

On March 3, 2016, defendant Raymond Snowden was charged by way of grand jury indictment with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1.) This matter is now before the court on defendant Raymond Snowden's motion to dismiss that indictment and to suppress evidence. At the request of the defense, an evidentiary hearing on the motion to suppress evidence was held on September 8, 2016. Assistant United States Attorney Kim Sanchez appeared at the hearing on behalf of the government, and attorney Scott Quinlan appeared on behalf of defendant Snowden.

Having considered the evidence presented and the arguments of the parties, for the reasons set forth below, the court will deny defendant's motion to dismiss the indictment and motion to suppress evidence seized as a result of his encounter with police.

/////

/////

1

**BACKGROUND**

According to police reports and testimony presented at the evidentiary hearing[1] held in connection with the pending motion to suppress evidence, the following events took place. On January 9, 2016, at approximately 11:15 p.m., Fresno Police Department ("FPD") officers were dispatched to the area of Clark Street and Saginaw Way regarding a possible disturbance. (Doc. No. 22-2, Ex. B.) Officers arrived and heard gunshots fired in the area of Pontiac Way and Clark Street. (*Id.*) Officers later discovered that a shooting had occurred at 2025 East Pontiac Way in the area of the Peppertree Apartments. (*Id.*) Officers Barnum and Galindo observed the victims' vehicle driving north on Clark Street with numerous gunshot strikes. (*Id.*) After the officers detained the victims, the victims pointed out and identified the suspect vehicle driving nearby, and three suspects were subsequently arrested.[2] (*Id.*) The victims of the shooting and all three subsequently arrested suspects were African Americans. (*Id.*)

The Peppertree Apartments are considered the turf of the Northside Goon Squad Gang, part of the MUG alliance of Fresno gangs. Those apartments are a high crime area known to police for gun possession, shootings, and narcotic sales where Goon Squad gang and MUG alliance members frequently congregate. The victim of the January 9th shooting was believed to be affiliated with the Goon Squad gang, although he had denied that was the case, and the three suspects who were arrested were members of the West Roy Gang, which was affiliated with the TWOMP alliance of Fresno gangs. Police therefore believed that the shooting was gang related, and there was a concern on their part of gang retaliation. Accordingly, FPD officers continued to investigate the circumstances surrounding the January 9th shooting. (Doc. No. 22-1, Ex. A.)

During the week of February 1, 2016, Detective Price and Sergeant Boston drove a marked patrol vehicle to the Peppertree Apartments at 2025 East Pontiac Way. (*Id.*) The officers saw eight to ten African American males standing in the north end of the parking lot. (*Id.*)

---

[1] The court found the testimony of Detective Price and Officer Lucero to be generally credible, except as noted below, as well as consistent with Officer Lucero's body camera video to the extent that video depicted the interaction between police and the individuals gathered in the parking lot on the afternoon of February 9, 2016.

[2] Police appear to have believed that there was a fourth suspect who was not arrested.

2

1   However, before the officers were able to make contact with these individuals, they fled in
2   multiple directions. (*Id.*) On February 9, 2016, at approximately 1:00 p.m., Detective Price and
3   Officer Lucero were assigned together for patrol, and Price suggested that they drive their
4   unmarked vehicle into the parking lot of the Peppertree Apartments to continue the investigation,
5   hoping that by using an unmarked vehicle they would have a better chance of successfully
6   making contact with individuals gathered there. (*Id.*) Specifically, Detective Price hoped to
7   make contact with anyone gathered in the parking lot, in order to determine if there were any
8   additional witnesses to the January 9th shooting and to learn whether Goon Squad gang members
9   and those associated with them were arming themselves for potential retaliation against the West
10  Roy Gang because of the shooting.[3]

11         As the officers drove their unmarked car into the parking lot, they observed a group of
12  four black males standing in front of a SUV and a Mercedes parked in the lot. (*Id.*) As police
13  drove toward them, one of the men positioned at the front of the parked SUV looked at the
14  officers, then turned toward the other men as if communicating with them, and thereafter ducked
15  down. This activity raised a concern for officer safety in Detective Price's mind, and when the
16  unmarked car reached the parked cars, Price got out and drew his gun as he approached the rear
17  of the parked cars quickly. When he reached the rear of the SUV, Detective Price saw another
18  black male squatted down with his left arm extended underneath the front right passenger tire of
19  the SUV.[4] Price then heard the clank of a metal object hitting the ground and the black male
20  (later identified as defendant Snowden) stood up, looked at Price and moved away from the area

---

[3] At the evidentiary hearing, Detective Price also testified that he believed the victim of the January 9th shooting lived at the Peppertree Apartments and he hoped to locate the victim, who had an outstanding warrant, arrest him, and see if he would make any additional statement about the shooting. However, Officer Lucero testified that Detective Price never mentioned this purpose for the entry into the parking lot. As noted at the hearing, if this was one of Detective Price's purposes in entering the apartment complex parking lot on the day in question, it had to be far down the list of possible goals. Indeed, not only do the odds of encountering the victim in the parking lot seem slim, that purpose was so unimportant that Detective Price did not mention it to his partner, Officer Lucero.

[4] Officer Lucero testified that he had seen both men duck down as police approached them and, as a result, Lucero exited the unmarked patrol car with his gun drawn as well, instructing the men to show their hands.

of the clanking sound. Detective Price immediately detained Snowden and directed Officer Lucero to the area of the clanking sound where Lucero retrieved the firearm from underneath the SUV. It is that gun upon which the current prosecution for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) is based. (*See* Doc. No. 1.) After the firearm was seized and defendant Snowden was placed in handcuffs, back-up officers were called and arrived at the scene within approximately two minutes. Defendant Snowden stated to Detective Price that he did not possess the firearm.

Against this background, the court will now address both of the pending motions brought on behalf of defendant Snowden.

## MOTION TO DISMISS INDICTMENT

**I.     Arguments**

Defendant Snowden moves for dismissal of the indictment, arguing that it resulted from selective enforcement of the law based solely on his race. (Doc. No. 17.) Defense counsel argues that when Detective Price and Officer Lucero arrived at the Peppertree Apartments on February 9, 2016, defendant was neither a known gang member nor a suspect in the shooting that had occurred January 9, 2016. (*Id.* at 7.) Rather, defendant Snowden was only suspected of being one of four black men standing in the parking lot. (*Id.*) Because detaining him solely based on his race would be a violation of his rights under the United States Constitution, defendant Snowden argues that the pending indictment should be dismissed. (*Id.*)

In its opposition to the motion to dismiss, the government contends defendant has failed to establish a selective enforcement claim because he has not shown a discriminatory effect, e.g., that non-black individuals similarly situated were treated differently. (Doc. No. 22 at 5–6.)

**II.    Applicable Legal Standard**

Equal protection of the law is denied when state officials enforce a valid statute in a discriminatory fashion. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). The Equal Protection Clause of the Fourteenth Amendment prohibits discriminatory enforcement of criminal laws. *Rosenbaum v. City & Cty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)). To prevail on such a claim, the claimant "must

4

1  demonstrate that enforcement had a discriminatory effect and the police were motivated by a
2  discriminatory purpose." *Id.* (citing *Wayte*, 470 U.S. at 608); *see also Lacey v. Maricopa County*,
3  693 F.3d 896, 920 (9th Cir. 2012).  To do so, one making such a claim must prove that the
4  decision to enforce the law against him was made "on the basis of an impermissible ground such
5  as race, religion or exercise of . . . constitutional rights." *Lacey,* 693 F.3d at 922 (quoting *United
6  States v. Kidder*, 869 F.2d 1328, 1336 (9th Cir. 1989).  The standard for proving a discriminatory
7  effect "is a demanding one." *Lacey,* 693 F.3d at 920 (quoting *United States v. Armstrong*, 517
8  U.S. 456, 465 (1996)).  To establish discriminatory effect, a claimant must demonstrate that
9  similarly situated individuals outside the protected class were treated differently.  *Rosenbaum*,
10 484 F.3d at 1152 (citing *Armstrong*, 517 U.S. at 465); *see also Lacey,* 693 F.3d at 920; *Freeman
11 v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) ("[I]t is necessary to identify a 'similarly
12 situated' class against which the plaintiff's class can be compared.");*United States v. Duque-
13 Nava*, 315 F. Supp. 2d 1144, 1153 (D. Kan. 2004) ("[C]ourts have required a defendant to make a
14 credible showing that a similarly situated individual of another race or ethnicity could have been
15 subjected to the same law enforcement action as the defendant, but was not.").  To establish
16 discriminatory purpose, the second prong of such a claim, a claimant must show that law
17 enforcement officers "selected or reaffirmed a particular course of action at least in part because
18 of, not merely in spite of, its adverse effects upon an identifiable group." *Rosenbaum*, 484 F.3d at
19 1152 (quoting *Wayte*, 470 U.S. at 610) (internal quotations omitted).

20 **III.    Discussion**

21        In short, defendant Snowden has failed to make any showing with respect to either prong
22 of a selective enforcement claim.[5]

23        Here, police officers went to the parking lot of the Peppertree Apartments in an attempt to
24 locate witnesses to a gang-related shooting that had taken place there the prior month and to
25 attempt to determine whether members of the Goon Squad gang and other MUG alliance gang

---

[5] In light of the lack of any such showing, the court need not address whether dismissal is the appropriate remedy were selective enforcement of the criminal law were established.  *See United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1055–59 (N.D. Cal. 2016) (examining legal authority supporting dismissal as a remedy for selective enforcement).

members who were known to congregate there were arming themselves to retaliate for the shooting. The defense has made no showing whatsoever that the officers went to the location to stop or detain anyone. In fact, when Detective Price went to the same location the prior week and the eight individuals congregating in the parking lot fled, there is no suggestion that he pursued them in an attempt to detain them. This time, however, two of the four individuals gathered around the cars ducked behind those vehicles so as not to be seen by the approaching officers. That action resulted in both officers becoming concerned for their safety. Defendant Snowden apparently discarded the gun in question just as he came back within Detective Price's view, at which time the gun was retrieved and Snowden was detained.

Defendant Snowden points only to the fact that he and the other three individuals gathered in the parking lot were black in arguing for dismissal of the indictment based upon alleged discriminatory enforcement. However, he has made no credible showing even suggesting thatsimilarly situated individuals who were not black were treated differently than he was. *See Armstrong*, 517 U.S. at 465; *Lacey,* 693 F.3d at 92; *Rosenbaum*, 484 F.3d at 1152; *Duque-Nava*, 315 F. Supp. 2d at 1153.[6] Thus, defendant has failed to meet the demanding standard for proving a discriminatory effect. *Lacey,* 693 F.3d at 920. Likewise, defendant Snowden has made no showing that Detective Price and Officer Lucero selected the course of investigative action they pursued on the day in question with a discriminatory purpose. *Wayte*, 470 U.S. at 610; *Rosenbaum*, 484 F.3d at 1152.

Having failed to make any showing satisfying either prong of the applicable test, defendant Snowden's motion to dismiss based upon alleged selective enforcement must be denied.

---

[6] Indeed, defendant has not identified a similarly situated class against which the class he is a member of can be compared. *See Freeman*, 68 F.3d at 1187. Moreover, the percentage of "discretionary interviews" conducted by Fresno Police Department officers for the period April 1 through June 30, 2016, of various racial groups, as reported by the *Fresno Bee*, does not support defendant's conclusory assertion of selective enforcement advanced in his motion. (*See* Doc. No. 21-1.) Finally, defendant's contention that officers drove past a Caucasian women walking in front of the apartment complex as they drove into the parking lot and did not stop to question her (Doc. No. 23 at 3) does not support defendant's claim in light of the officers' credible testimony regarding their purpose for questioning those congregated in the parking lot.

# MOTION TO SUPPRESS THE GUN

## I.  Arguments

Defendant Snowden moves to suppress the gun that was seized by officers from underneath the SUV. Specifically, he argues that the seizure of the gun by police officers stemmed directly from his unlawful detention. In this regard, the defendant suggests that he was unlawfully detained without reasonable cause as soon as the officers exited their unmarked patrol car with guns drawn while ordering him and the others to "stop" or to "show their hands." Finally, defendant contends that he has standing to move to suppress the gun from evidence because any perceived abandonment of the gun on his part was tainted and caused by his unlawful detention.

The government opposes the pending motion to suppress evidence on several alternative grounds. First, based upon the decision in *United States v. Decoud*, 456 F.3d 996 (9th Cir. 2006), *cert. denied*, 551 U.S. 1116 (2007), the government argues defendant Snowden gave up any expectation of privacy by unequivocally disclaiming his ownership or possession of the gun to police. Second, the government contends that there was no seizure of the gun at all because the evidence establishes that the defendant discarded it prior to submitting to police authority. (Doc. No. 22 at 8–9 (citing *California v. Hodari D*., 499 U.S. 621, 625 (1991), and *United States v. McClendon*, 713 F.3d 1211, 1217 (9th Cir. 2013)).) Finally, the government argues that even if defendant Snowden had standing as well as a reasonable expectation of privacy and that a seizure of the gun by police occurred, any investigative detention and seizure of the gun were supported by a reasonable suspicion that criminal activity was afoot. (*Id*. at 10.)

## II.  Legal Standard

With respect to standing and one's reasonable expectation of privacy, the Ninth Circuit has stated:

> To have standing to seek suppression of the fruits of [an officer's] search, [the defendant] must show that he personally had "a property interest protected by the Fourth Amendment that was interfered with . . ., or a reasonable expectation of privacy that was invaded by the search." *United States v. Padilla*, 111 F.3d 685, 688 (9th Cir. 1997) (quoting *United States v. Padilla*, 508 U.S. 77, 82, 113 S. Ct. 1936, 123 L.Ed.2d 635 (1993)). . . .

\* \* \*

> The reasonable expectation of privacy turns on (1) whether the person had "an actual (subjective) expectation of privacy," and (2) whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).  In short, it turns on whether the individual's subjective expectation of privacy is objectively reasonable. *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007) (citation omitted).

*United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013).

In moving to suppress evidence, it is the defendant's burden to establish his standing to do so. *Id.* at 808; *see also Minnesota v. Carter*, 525 U.S. 83, 88 (1990). Moreover, "a defendant who voluntarily abandons property has no standing to contest its search and seizure." *United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000); *see also United States v. Garcia*, 909 F.2d 389, 391 (9th Cir. 1990); *United States v. Kendall*, 655 F.2d 199, 202 (9th Cir. 1981) ("Williams was just like the bank robber who having a gun, finds himself pursued, and in his hope of escaping detection throws the gun into a yard where, if it is not picked up he might retrieve it. Such conduct is transparently an abandonment of the tight grip of ownership . . . .") (quoting *United States v. Williams*, 569 F.2d 823, 826 (5th Cir. 1978)). However, abandonment is a question of intent and an abandonment of property that results from a Fourth Amendment violation cannot be voluntary. *Stephens*, 206 F.3d at 917. An unequivocal disclaimer of ownership may, under some circumstances give up one's reasonable expectation of privacy with respect to property. *United States v. Decoud*, 456 F.3d 996, 1008 (9th Cir. 2006); *but see Lopez-Cruz*, 730 F.3d at 809 (distinguishing *Decoud* because in that case the defendant both disavowed ownership of a briefcase but also explained that he did not know how to open it and clarifying that "none of our 'abandonment' cases has held that mere disavowal of ownership, without more, constitutes abandonment of a person's reasonable expectation of privacy in that property").

A reasonable suspicion that one is engaged in criminal activity justifying a detention may arise from an individual's unprovoked flight from police officers when it occurs in a high-crime rate neighborhood. *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000); *United States v. Smith*, 633 F.3d at 889, 893 (9th Cir.), cert. denied 564 U.S. 1010 (2011). Likewise, an individual's

8

conduct in ducking down from the sight of approaching police has also been recognized as a factor in establishing reasonable suspicion of criminal activity and/or of being armed. *See United States v. McGregor*, No. CR 12-00200 WHA, 2012 WL 6680059, at *4 (N.D. Cal. Dec. 21, 2012) ("The officers observed defendant react to their approaching vehicle (a vehicle closely associated with the police) by stopping and turning in the other direction, then ducking down briefly behind a parked car. In the officers' experience, defendant's actions signaled an attempt to discard contraband or firearms, or at least a contemplation of doing so."); *see also* U*nited States v. Craver*, No. 3:09cr139, 2010 WL 2303253, at *7 (S.D. Ohio. June 7, 2010) ("an individual's conduct in . . . hiding or ducking down, can assist in establishing reasonable suspicion that he or she is armed"). While one's mere presence in a high-crime rate area alone does not support a reasonable suspicion, police officers "may take into account the context in which suspicious activity occurs 'in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" *Smith*, 633 F.3d at 893–94 (quoting *Wardlow*, 528 U.S. at 124).

**III.    Discussion**

As noted above, the government argues that defendant Snowden's disavowal of his possession of the handgun following his arrest alone is a sufficient basis upon which this court should conclude that he had no reasonable expectation of privacy and lacks standing to seek suppression of the gun. In light of the Ninth Circuit's decision in *Lopez-Cruz*, however, the court is not persuaded by that argument. Disavowal alone, without more does not establish an abandonment of one's reasonable expectation of privacy. *Lopez-Cruz*, 730 F.3d at 809.

However, here there is more. The government's next argument—that defendant Snowden discarded the gun before submitting to police authority and that his abandonment precludes any claim of a Fourth Amendment violation—is well supported. In this regard, the Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621 (1991) is instructive. There, a group of juveniles huddled around a car took flight as an unmarked police patrol car approached them. 499 U.S. at 622. The officers were suspicious and gave chase. *Id.* As Officer Pertoso was about to catch up to the fleeing Hodari D., the youth tossed away a small rock. *Id.* The officer then tackled the youth and handcuffed him. *Id.* The discarded rock was later determined to be crack

9

cocaine. *Id.* In the subsequent juvenile proceedings, the youth moved to suppress the cocaine arguing that he had been seized when the officer ran toward him, that seizure was unreasonable and that the cocaine should therefore be suppressed as the fruit of the unlawful seizure. *Id* . The Supreme Court rejected that argument, holding:

> In sum, assuming that Pertoso's pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied.

*Hodari D.*, 499 U.S. at 629; *see also United States v. McClendon*, 713 F.3d 1211, 1215–17 (9th Cir. 2013) (concluding that a handgun discarded by defendant after he was told he was under arrest was not the fruit of a seizure); *Smith*, 633 F.3d at 892–93.

The decisions in *Hodari D.* and *McClendon* are controlling here. Based upon the evidence presented at the hearing, the court concludes that defendant Snowden had not submitted to police authority at the moment he discarded the firearm under the SUV. Rather, he had ducked behind the vehicle and out of sight as Detective Price and Officer Lucero approached. Although the officers got out of their unmarked car and drew their guns, defendant Snowden was still out of sight when they did so. As Detective Price reached the rear of the SUV, he then saw defendant Snowden squatted down with his left arm already extended underneath the front right passenger tire of the SUV and heard the clank of a metal object hitting the ground. Snowden then stood up, looked at Price and moved away from the area of the clanking sound. That evidence establishes that defendant Snowden had not submitted to police authority at the time he discarded the gun under the SUV and that he, in fact, had done the opposite. Therefore the gun was not the fruit of a seizure at all. Rather, defendant Snowden abandoned the gun by discarding it. On this basis alone, his motion to suppress evidence must be denied.

Even were that not the case and defendant Snowden could be found to have submitted to police authority, his detention was supported by a reasonable suspicion that criminal activity was afoot or by a legitimate concern for officer safety. The evidence submitted in connection with the pending motion established that the apartment parking lot in question is considered the turf of the

Goon Squad Gang, part of the MUG alliance of Fresno gangs, is a high-crime rate area known to police for gun possession, shootings and narcotic sales and as a location where Goon Squad gang and MUG alliance members frequently congregate.  In this context, defendant Snowden's suspicious conduct (as well as that of one of the other men gathered there) in ducking down behind the parked SUV out of the sight of the approaching police gave rise to a reasonable suspicion of criminal activity and/or a threat to officer safety justifying his detention.

## CONCLUSION

For all of the reasons set forth above, defendant Snowden's motions to dismiss the indictment due to selective enforcement in violation of the Fifth and Fourteenth Amendments and to suppress evidence seized in violation of the Fourth Amendment (Doc. No. 17) are denied.  The dates for further proceedings in this action, set forth in the December 12, 2016 minute order, remain in effect.

IT IS SO ORDERED.

Dated:   **February 15, 2017**                                  *Dale A. Drozd*
                                                                 UNITED STATES DISTRICT JUDGE